No. 92,956

STATE OF KANSAS, *Appellee*, v. RONALD JOHNSON, *Appellant*.
(159 P.3d 161)

Opinion filed June 8, 2007.

*Rebecca E. Woodman,* of Capital Appellate Defender Office, argued the cause, and *Sarah Ellen Johnson,* of Kansas Appellate Defender Office, and *Ronald Johnson,* appellant pro se, were on the briefs for appellant.

*Jerome A. Gorman,* district attorney, argued the cause, and *Phill Kline,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

JOHNSON, J.: Ronald Johnson appeals his conviction and sentence for one count of premeditated first-degree murder. Appellate counsel raises seven issues on appeal and Johnson purports to raise additional issues in a supplemental pro se brief. Finding no reversible error, we affirm.

On November 26, 2001, the Kansas City police responded to a call from an individual stating that his mother had been killed. The officers found the deceased victim, Dorothy Griffin, lying in a pool of blood in the doorway of a bathroom located at the end of the

hallway in the front of her residence. A crime scene investigator found a bloody footprint inside the front door, blood spatters on the wall near the front door, and blood on the ceiling, floor, and walls trailing down the hallway to the body's location. Overturned and broken furniture and broken glass suggested that Griffin had struggled with her assailant.

The son, Clarence Jones, lived in the home. He testified that on the day of the murder, he stopped by the house after work before going to his sister's home. When Clarence returned home between 10:30 and 10:45 p.m., he found the front door open, observed broken glass and blood, and discovered Griffin on the floor in a pool of blood. When he was unable to get a dial tone on the house telephone, he drove to a nearby store to call the police.

The defendant had been dating the victim "off and on" for a number of months prior to the murder. On the day of the murder, Johnson was at his sister's home, where his niece, Ashlee, observed defendant take a knife from the kitchen counter and put it in his jacket. When Johnson noticed Ashlee, he put his fingers to his lips as if to say "be quiet." The next day, after learning of Griffin's death, Ashlee related the incident to her mother.

The evening of the murder, defendant's sister, Kwana, drove him to Griffin's home, ostensibly to pick up some of his belongings. Three other passengers were in the car: Rorena Williams, Roy Williams, and James Jefferson. Kwana recognized Griffin as the person who answered the door and let the defendant into the house, while the others waited in the car. When Johnson returned to the car, he had blood on his hand, face, and clothing and appeared anxious. In response to questioning from Kwana, Johnson repeatedly said, "Let's go."

Kwana learned of Griffin's death the next day. When Ashlee related that she had seen Johnson take a knife from their kitchen, Kwana realized that the largest knife from her butcher block was missing. Two of Johnson's jackets were recovered from Kwana's washing machine. Swabs taken from the drain hose tested positive for blood, albeit the samples were insufficient to yield a conclusive result from DNA analysis.

At trial, the State presented evidence of two confrontations between the defendant and the victim within the 2 weeks before the murder. Griffin's younger brother, Jimmy Jones, testified that he went to his sister's house about 2 weeks before her death after hearing that Johnson had beaten Griffin. Jimmy discovered Johnson walking a few blocks from Griffin's house, picked him up, and took him back to the house. Griffin told Jimmy that she did not want Johnson in the home any more. Jimmy and a cousin moved Johnson's belongings out of the house and gave him a ride to Olathe. Jimmy did not testify that Griffin said she was beaten or that Griffin had any visible injuries.

Clarence, a security guard, and one of Griffin's coworkers, all testified about an incident in the parking lot where Griffin worked, during which the defendant prevented Griffin from driving away from the parking lot by jumping on the hood of the car. Johnson would not leave, and the security guard had to escort Griffin back into the building. The guard filed a security report and called the police.

The forensic pathologist reported finding eight stab and slice wounds on the victim. The wounds were to the head, upper body, and forearms, including a stab wound that penetrated the heart. Three of the wounds were identified as defensive wounds. Griffin's left forearm was also broken. The cause of death was blood loss from the stab wounds.

After the jury convicted Johnson of first-degree, premeditated murder, the State sought a life sentence without the possibility of parole for 50 years (the hard 50) and presented a notice of intent to offer aggravating factors pursuant to K.S.A. 2006 Supp. 21-4635. Specifically, the State alleged that there was prior stalking of or criminal threats to the victim; preparation or planning, indicating an intention that the killing was meant to be especially heinous, atrocious, or cruel; infliction of mental anguish or physical abuse before victim's death; torture of the victim; continuous acts of violence begun before or continuing after the killing; and any other conduct in the opinion of the court that was especially heinous, atrocious, or cruel.

Johnson objected to the constitutionality of the hard 50 statute on the basis that the district court could not make a finding of aggravating circumstances under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Johnson also presented the testimony of a clinical psychologist, who opined that Johnson suffered from a psychotic disorder with hallucinations and delusions. Nevertheless, the district court imposed the hard 50 sentence, finding that the aggravating factors outweighed any mitigating factor of mental illness. The court found the prior stalking, the violent relationship of Griffin and Johnson, and the physical force employed to inflict the wounds, together with the manner in which the victim fought for her life, constituted aggravating circumstances.

## CONSTITUTIONALITY OF THE HARD 50 SENTENCE

Johnson begins by arguing that the hard 50 sentencing scheme is unconstitutional because it permits the sentencing judge to find facts that enhance the available sentencing range, utilizing a preponderance of the evidence standard, in violation of *Apprendi*, 530 U.S. 466, and *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999). The constitutionality of a statute is a question of law subject to de novo review. *State v. Brown*, 280 Kan. 898, 900, 127 P.3d 257 (2006).

Johnson acknowledges that this court found the hard 40 sentencing scheme constitutional in *State v. Conley*, 270 Kan. 18, 35-36, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). Nevertheless, he urges us to revisit the *Conley* decision in light of recent case law. However, this court has consistently rejected similar arguments and declined to overrule *Conley*. See, *e.g.*, *State v. Lawrence*, 281 Kan. 1081, 1096, 135 P.3d 1211 (2006); *State v. Buehler-May*, 279 Kan. 371, 386, 110 P.3d 425, *cert. denied* 546 U.S. 980 (2005); *State v. James*, 279 Kan. 354, 358, 109 P.3d 1171 (2005); *State v. Robertson*, 279 Kan. 291, 308, 109 P.3d 1174 (2005); *State v. Hurt*, 278 Kan. 676, 686-88, 101 P.3d 1249 (2004).

The United States Supreme Court continues to invalidate judicial preponderance of the evidence fact finding that exposes a defendant to a sentence in excess of the statutory maximum as being

a violation of a defendant's right to trial by jury safeguarded by the Sixth and Fourteenth Amendments to the United States Constitution. See, *e.g.*, *Cunningham v. California*, 549 U.S. 270, 166 L. Ed. 2d 856, 127 S. Ct. 856 (2007). Nevertheless, our highest court has not explicitly overruled its prior holdings that judicial fact finding utilizing a preponderance of the evidence standard to increase the mandatory *minimum* sentence does not run afoul of the jury trial guarantee. See, *e.g.*, *McMillan v. Pennsylvania*, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986). The maximum sentence for first-degree murder is life in prison. The hard 50 sentence enhances the minimum sentence which must be served and does not expose a defendant to a higher maximum sentence than provided by statute. Under current law, our hard 50 scheme is constitutional.

## SUFFICIENCY OF THE EVIDENCE OF AGGRAVATING CIR-CUMSTANCES

Johnson challenges the district court's finding under K.S.A. 2006 Supp. 21-4636(f) that the murder was committed in an especially heinous, atrocious, or cruel manner. He argues the evidence was insufficient to support aggravating circumstances.

" 'When a defendant challenges the sufficiency of evidence for establishing the existence of an aggravating circumstance in a hard 50 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence.' *State v. Buehler-May*, 279 Kan. 371, Syl. ¶ 12, 110 P.3d 425 (2005)." *State v. Washington*, 280 Kan. 565, 568, 123 P.3d 1265 (2005), *cert. denied* 549 U.S. 1018 (2006).

When a defendant is convicted of premeditated first-degree murder, Kansas law provides that the district court shall determine whether the defendant shall be required to serve a mandatory term of imprisonment of 50 years without eligibility for parole. K.S.A. 2006 Supp. 21-4635(b); K.S.A. 2006 Supp. 21-4638. The district court is required to make the hard 50 determination after considering evidence of aggravating and mitigating circumstances. K.S.A. 2006 Supp. 21-4635(c). If the district court finds that one or more of the aggravating circumstances enumerated in K.S.A. 2006 Supp. 21-4636 exists and that the existence of such aggravating circum-

stances is not outweighed by any mitigating circumstances, the defendant shall receive the hard 50 sentence. K.S.A. 2006 Supp. 21-4635(d).

The pertinent statutory aggravating circumstance in the present case is defined as follows:

"(f) The defendant committed the crime in an especially heinous, atrocious or cruel manner. A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel. In making a determination that the crime was committed in an especially heinous, atrocious or cruel manner, any of the following conduct by the defendant may be considered sufficient:

(1) Prior stalking of or criminal threats to the victim;

(2) preparation or planning, indicating an intention that the killing was meant to be especially heinous, atrocious or cruel;

(3) infliction of mental anguish or physical abuse before the victim's death;

(4) torture of the victim;

.  .  .  .

[or]

(7) any other conduct in the opinion of the court that is especially heinous, atrocious or cruel." K.S.A. 2006 Supp. 21-4636(f).

Here, the judge stated the following reasons for his decision to impose the hard 50:

"And the reasons and rationale for the Court's decisions are this; the prior stalking, the violence of the relationship, how it had transformed from a normal relationship into a violent relationship, but I suspect most of it is the—the brutal [ferocity] of the attack. The physical force required to inflict the wounds upon the victim in this case are unconscionable. They are incredible based upon her size and the size and force used against her. We've got a situation that occurred in not quite five minutes. We forensically can tell that the attack occurred in the hallway just behind the door and for how ever many feet, 6 feet, 10 feet, whatever, the victim in this case knew that she was going to die when the defendant pulled out the butcher knife and started slashing and attacking her. The defensive wounds alone show that she was alive and was able to contemplate her death while—while the defendant was attacking her.

"The sheer force necessary to go through her eye and end up out by her ear, the force used to go through the forearm which was thrust up to prevent a blow and breaking a bone in her arm, the slashing of the shoulder rendering it virtually useless, the depth, the strength required to—to commit this blow is staggering. She was basically helpless when the final blow, the one to the chest that pierced

the rib cage and the heart and the musculature around it, there was no doubt that it was the defendant's intention to kill the victim in this case, but it was not a swift death. The fatal blow through the heart was the one that incapacitated the victim . . . and caused her death and the others without attention certainly would have caused her death. But there's no doubt that the method employed by the defendant—it didn't make any difference what kind of knife.

"I don't lend any credence or much weight to the evidence that he, in fact, just chose a butcher knife. One thrust could have ended her life and we wouldn't be talking about a hard 50. What we're talking about is somebody that didn't choose to die peacefully, who fought for her life. And those few instances and moments or minutes logically that she struggled for her life before, in fact, the defendant took it, that, in fact, makes it the atrocious, heinous, brutal, vicious type of crime that, in this Court's opinion, is suited for the hard 50 sentence."

Johnson chooses to focus on two aspects of the district court's findings, the mention of prior stalking and the brutal ferocity of the attack. The argument is structured as a challenge to the sufficiency of the evidence to support the findings.

*Stalking*

With respect to the alleged prior stalking, Johnson urges us to apply the definition of stalking found in our criminal code, *i.e.*, "an intentional, malicious and *repeated* following or harassment of another person." (Emphasis added.) See K.S.A. 2006 Supp. 21-3438. As such, Johnson argues that the two confrontations shortly before the murder are insufficient to establish the repetitive conduct which is the gravamen of stalking.

While Johnson makes a colorable argument against labeling his conduct during the 2 weeks prior to the murder as the "prior stalking" contemplated by 21-4636(f)(1), such a determination would make scant difference in our analysis. Under 21-4636(f)(7), the district court is permitted to consider "any other conduct in the opinion of the court that is especially heinous, atrocious or cruel." Therefore, Johnson's conduct during the weeks prior to the murder can be considered by the court, regardless of the label assigned to that conduct.

In 1999, the legislature added a specific reference to stalking in the statute applicable to the hard 50 sentence, 21-4636(f), but did not make the same amendment to the aggravating circumstances provision in capital cases, K.S.A. 21-4625. In *State v. Kleypas*, 282

Kan. 560, 566-68, 147 P.3d 1058 (2006), the court discussed whether stalking was relevant and admissible in a capital murder case to establish the aggravating factor that a killing was done in an especially heinous, atrocious, or cruel manner, notwithstanding the absence of a specific reference to stalking in the applicable statute. *Kleypas* noted that "mental anguish before death" can be the basis for finding a murder to be especially heinous, atrocious, or cruel and that "[m]ental anguish includes a victim's uncertainty as to his or her ultimate fate." 282 Kan. at 569. The court then declared that "evidence that a defendant stalked the victim and *the victim was aware of the possibility of the violence which awaited him or her* can be relevant to the determination of whether the capital murder was committed in an especially heinous, atrocious, or cruel manner for purposes of the death penalty." (Emphasis added.) 282 Kan. at 569.

Here, as the district court noted, the relationship between Griffin and Johnson had gone through a transformation. First, the incident described by Johnson as "simply a domestic disturbance between two cohabitants" resulted in the couple's estrangement. Then, in the parking lot incident, Johnson confronted Griffin, prevented her from leaving in her vehicle by jumping on the hood, and refused to disengage when confronted by a security guard. As described by the guard, Johnson's conduct was obviously intended to intimidate, if not terrorize, Griffin. Under such circumstances, one can reasonably infer that Griffin "was aware of the possibility of the violence which awaited . . . her," regardless of whether we label the conduct as a stalking, a criminal threat, or other conduct manifesting an especially heinous, atrocious, or cruel behavior.

### Brutal Ferocity

Johnson contends that the facts that multiple stab wounds were inflicted and that the victim was cognizant of the attack are insufficient to establish that the murder was committed in an especially heinous, atrocious, or cruel manner. He relies principally on *State v. Follin*, 263 Kan. 28, 51, 947 P.2d 8 (1997), and *State v. Cook*, 259 Kan. 370, 400-01, 913 P.2d 97 (1996). Both cases are factually distinguishable.

In *Cook*, the victim was shot twice, once in the chest and once in the back, while in bed as a patient. Among its arguments, the State contended that the "pain, suffering, fear and knowledge of impending death experienced by the victim before he bled to death" was a form of torture. 259 Kan. at 403. The opinion noted that most of the State's arguments about the "torture" the victim experienced were "based on conjecture or speculation." 259 Kan. at 403. Accordingly, the court found that the evidence did not support a finding that the shooting was committed in a special or unusual degree or to an extent greater than in other cases so as to be particularly heinous, atrocious, or cruel. 259 Kan. at 403.

In contrast, the physical evidence in this case indicated to the pathologist that Griffin was upright as she moved down the hallway to the place her body was found in a pool of blood. The physical evidence showed that, along the hallway, blood sprayed from her body from the multiple stab and slice wounds inflicted by the murderer. The blows were imprecisely delivered with considerable force, one of which broke the ulna in Griffin's forearm. Broken furniture and glass, together with the defensive wounds identified by the pathologist, indicate that Griffin fought for her life during the ferocious attack. We need not resort to conjecture and speculation to find that Johnson inflicted mental anguish upon his victim, but rather such a conclusion is a reasonable inference to be drawn from the proven facts.

In *Follin*, the defendant stabbed his two young daughters to death. There were three stab wounds in the chest and upper abdomen of each child. There were no defensive wounds. The pathologist testified that the person who committed the murder had knowledge of anatomy and the location of the heart because he placed the knife between the ribs and not through the bone. In its review of aggravating circumstances, the court noted that stab wounds inflicted to kill, even if multiple, probably would not constitute evidence sufficient to establish the aggravating circumstance. However, stab wounds inflicted to maim, torture, or inflict pain could constitute the aggravating circumstance. 263 Kan. at 51 (citing Annot., 63 A.L.R.4th 478). This court concluded that there was insufficient evidence that the defendant inflicted mental an-

guish or physical abuse before the victims' deaths. However, other aggravating circumstances were upheld, and the hard 40 sentence was affirmed. 263 Kan. at 52-53.

Johnson suggests that *Follin* instructs us that multiple stab wounds are immaterial to the heinous, atrocious, or cruel analysis if the murderer intended the blows to kill the victim. However, we perceive the *Follin* court was persuaded by the precise manner in which the wounds were inflicted into the heart while avoiding the ribs, so as to expedite death and minimize the preceding pain and suffering. In contrast, the nature and location of Griffin's multiple wounds suggest that they were repeatedly delivered in a random and forceful manner consistent with a desire to hurt the victim, rather than to effect a quick kill.

Perhaps more importantly, both *Cook* and *Follin* were decided before the 1999 amendment to 21-4636(f). The amendment clarified and expanded the definition of conduct that may be considered sufficient to show that particular aggravating factor, specifically adding that

"[a] finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel." L. 1999, ch. 138, sec. 1.

The amendment was apparently prompted by this court's prior restrictive application of the heinous, atrocious, or cruel aggravator. *Kleypas* declared that the amendment was in response to the finding of insufficient evidence to establish the heinous, atrocious, or cruel factor in *State v. Spry*, 266 Kan. 523, 973 P.2d 783 (1999). *Kleypas*, 282 Kan. at 566-67. *Spry* relied upon and cited *Cook* and *Follin*. Accordingly, the efficacy of the *Cook* and *Follin* holdings must be viewed with caution, in light of the subsequent statutory amendment.

Likewise, Johnson's citation to decisions from foreign jurisdictions is unpersuasive. See, *e.g.*, *Simmons v. State*, 419 So. 2d 316 (Fla. 1982), and *Patrick v. State*, 247 Ga. 168, 274 S.E.2d 570 (1981). Those cases can be distinguished on their facts or on the law peculiar to the foreign jurisdiction.

In short, we find that the evidence was sufficient to support the findings that Johnson made Griffin aware of the possibility of the violence which awaited her and that Johnson subsequently attacked Griffin in a brutal and ferocious manner, forcibly overcoming her attempts to protect herself. Those findings supported the aggravating factor that the crime was committed in an especially heinous, atrocious, and cruel manner. The imposition of the hard 50 sentence is affirmed.

## MISTRIAL

The district court granted Johnson's motion in limine to preclude any statements about the defendant's criminal record or any previous murder charges. At trial, two of the State's witnesses mentioned that they had met Johnson when he was released from jail, apparently about 3 weeks prior to the murder. The first, Rorena Williams, made the statement in response to defense cross-examination as to how long she had known Johnson. Roy Williams' statement came in response to the State's question as to the number of times he had seen Johnson.

Johnson did not contemporaneously object to the responses. Subsequently, he moved for a mistrial, based upon a violation of the limine order. The district court found that because neither witness mentioned a criminal record or any murder charges, the order in limine had not been violated. On appeal, Johnson challenges that ruling.

The State contends that the issue has not been preserved for appeal because of Johnson's failure to contemporaneously object. Cf. State v. Franklin, 280 Kan. 337, 340, 121 P.3d 447 (2005) (when a motion in limine is denied, the moving party must object to the evidence at trial to preserve the issue on appeal). However, Johnson did move for a mistrial, and the district court had an opportunity to rule on the merits. Therefore, we will consider the issue and apply the abuse of discretion standard applicable to a mistrial denial. See State v. Manning, 270 Kan. 674, 696, 19 P.3d 84 (2001).

State v. Gleason, 277 Kan. 624, 640, 88 P.3d 218 (2004) (quoting State v. Douglas, 274 Kan. 96, 109, 49 P.3d 446 [2002]), sets forth the following two-part test that courts use to evaluate alleged vio-

lations of an order in limine: " '(1) Was there a violation of the order in limine and (2) if the order in limine is violated, did the testimony substantially prejudice the defendant? The burden is on the defendant to show substantial prejudice. [Citation omitted.]' " The district court is in the best position to decide if its order in limine was violated and determine the degree of prejudice a violation may have caused the defendant. *State v. Whitesell,* 270 Kan. 259, 281, 13 P.3d 887 (2000).

We agree with the district court's determination that the witnesses' testimony did not technically violate the prohibition against statements about Johnson's criminal record or prior murder charges. Mentioning defendant's release from jail does not necessarily reveal the existence of a criminal record. *Cf. State v. Hartfield,* 245 Kan. 431, 439, 781 P.2d 1050 (1989) (discussing evidence that defendant on parole as indicative that defendant had committed a prior crime).

Further, the rather innocuous references to jail release as a temporal frame of reference for the witnesses' contact with the defendant did not violate the spirit of the limine order. That is especially so, given that the jury heard that the parking lot incident was reported to the police, suggesting that incarceration for that conduct was a possibility. Accordingly, we find no abuse of discretion in denying the mistrial motion.

## PROSECUTORIAL MISCONDUCT

Next, Johnson complains that the prosecutor committed reversible misconduct by asking a detective to comment on the credibility of the victim's son, Clarence. During the State's direct examination of Detective Terry Mast, the prosecutor questioned the detective about shoe prints that were found at the scene. The detective testified that Clarence told the police before they entered the residence that when Clarence found his mother in the house, he slipped in blood. In response to that statement, the police took Jones' shoes and compared their pattern with that found in the house, finding the patterns to be similar. The prosecutor then asked, "So, at that point, were you satisfied Clarence Jones was— was telling you the truth about what he had done?" Mast re-

sponded, "That's correct." There was no objection to the question, and the prosecutor continued with other questioning.

The State urges us to treat the issue as one of evidence admissibility, which was not preserved for appeal by a timely objection. Of course, Johnson styles the issue as one of prosecutorial misconduct because the absence of an objection is not fatal to our review of whether the misconduct rose to the level of plain error implicating the right to a fair trial. See *State v. Sperry*, 267 Kan. 287, 309, 978 P.2d 933 (1999) (the plain error rule may be used "where the prosecutor's misconduct is so prejudicial or constitutes a constitutional violation which, if not corrected, will result in injustice or a miscarriage of justice").

Although not mentioned by Johnson, this court in *Manning*, 270 Kan. at 697-702, reviewed whether the State committed prosecutorial misconduct during the cross-examination of the defendant. The prosecutor repeatedly asked the defendant whether two of the witnesses lied. *Manning* determined that the issue could be reviewed as a matter of prosecutorial misconduct, even in the absence of an objection. 270 Kan. at 697; see *State v. Dean*, 272 Kan. 429, 436-38, 33 P.3d 225 (2001); *State v. Diggs*, 272 Kan. 349, 361-62, 34 P.3d 63 (2001) (both applying *Manning*). Therefore, we will continue that trend.

We apply a two-step analysis to allegations of prosecutorial misconduct whether involving witness examination or closing argument. *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006). First, we decide whether the prosecutor exceeded the boundaries of permissible conduct. If so, we next decide whether the conduct constituted plain error, *i.e.*, whether the conduct was so prejudicial as to deny the defendant a fair trial. 280 Kan. at 779. In assessing the second step, we consider the three factors of (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will by the prosecutor; and (3) whether the evidence against the defendant was direct and overwhelming. See *State v. Tosh*, 278 Kan. 83, Syl. ¶ 2, 91 P.3d 1204 (2004).

As the question was phrased, the prosecutor asked the detective whether Jones was telling the truth. That exceeded the wide latitude afforded to prosecutors. "Questions which compel a defend-

ant or witness to comment on the credibility of another witness are improper. It is the province of the jury to weigh the credibility of the witnesses." *Manning*, 270 Kan. at 698. We find that the first prong of the test has been met.

Nevertheless, we find that the impropriety was not plain error. In context, it is readily apparent that the prosecutor was trying to elicit that the physical evidence corroborated Jones' statement to the police. The clumsy phrasing of the question was not gross or flagrant, did not manifest an ill will on the part of the prosecutor, and did not so prejudice the jury as to deny Johnson a fair trial. Accordingly, reversal is not required.

## *ADMISSIBILITY OF PHOTOGRAPHS*

Johnson asserts that the photographs, marked as State's Exhibits 13 through 25, were overly repetitious and gruesome, only serving to inflame the jury. However, the record reflects that defendant only objected to Exhibits 13, 14, 15, and 18. Therefore, Johnson's challenge to the remaining photographs was not technically preserved for appeal. See *State v. Torres*, 280 Kan. 309, 328, 121 P.3d 429 (2005). On the other hand, the practical effect of that procedural defect may be minimal, given that the assessment of the admissibility of the objected-to photographs involves a comparison of their relevance in relation to the other photographs.

The State offers the following well-established rules on the admission of photographs in a homicide trial:

" ' "The admission of photographs in a homicide case is a matter within the trial court's discretion, and the trial court's ruling will not be disturbed on appeal absent the showing of an abuse of that discretion. *State v. Verge*, 272 Kan. 501, 515, 34 P.3d 449 (2001). An abuse of discretion has occurred when the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice. The admission of photographs in a murder case has rarely been held to be an abuse of discretion. *State v. Deal*, 271 Kan. 483, 493, 23 P.3d 840 (2001).

" ' "Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case. *State v. Groschang*, 272 Kan. 652, 667, 36 P.3d 231 (2001). Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. Specifically, photographs which aid a pathologist in explaining the cause of death are admissible. *Deal*, 271 Kan. at 493. Photographs used to prove the manner of death and the

violent nature of the crime are relevant and admissible. *Groschang*, 272 Kan. at 667." ' " *State v. Parker*, 277 Kan. 838, 847, 89 P.3d 622 (2004) (quoting *State v. Green*, 274 Kan. 145, 147, 48 P.3d 1276 [2002]).

The photographs were admitted during the testimony of Dr. Erik Mitchell, who testified that the photographs would help illustrate his description of the injuries. We have held that photographs which aid a pathologist in explaining the cause of death and assist the jury's understanding of medical testimony are admissible when the photographs are relevant and material. *State v. Deal*, 271 Kan. 483, 493, 23 P.3d 840 (2001), *abrogated on other grounds by State v. Anthony*, 282 Kan. 201, 214, 145 P.3d 1 (2006). Here, there is no contention that the photographs show unnecessary autopsy procedures, *i.e.*, the gruesome nature of the photographs was caused by the gruesome manner in which the wounds were inflicted, not because the body was altered after the fact. *Cf. State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975).

There are a number of photographs, many of which appear to depict more than one wound. However, the doctor testified that each photograph gave a clearer view of a particular wound, notwithstanding that other wounds may have been visible in the photograph. Accordingly, we are unwilling to declare that the district court abused its discretion in permitting the doctor to utilize the photographs to fully explain his testimony.

## *REFUSING TO ADMIT DEFENSE EXHIBIT*

At trial, Johnson attempted to get a police evidence custody receipt admitted without laying a foundation for the document. The district court denied the defense's request to admit the custody receipt because it did not meet the criteria for a business records exception, and the defense failed to subpoena the maker of the report.

The front of the form identifies the suspect as Ronald E. Johnson, Jr., and lists the items that were taken into custody, *e.g.*, blood swabs and jackets. On the reverse of the form, someone had typed the following:

"On 11-26/2001, the victim was found in her residence. The victim had been stabbed to death by her son. The investigation [led] to the suspect and a warrant

was issued for his arrest. The investigation also [led] the investigators to Olathe where the vehicle used for the suspect's escape was located and a washer was used to wash his clothes. The suspects's coat [that] he was believed to be wearing during the murder was recovered in the washer with another coat. The drain was swabbed for blood tracings. The vehicle was processed and tracings were found on the passenger door and carpet."

Johnson argues that the exclusion of his proffered evidence denied him the right to pursue his defense and involves the interpretation of the hearsay statutes, requiring that we employ a de novo standard of review. Naturally, the State contends that we should use the abuse of discretion standard applicable for questions of the admissibility of evidence. However, we perceive the question will turn on the legal basis for the judge's decision. Specifically, whether the criteria for the business records exception to the hearsay rule were met. Therefore, a de novo standard is appropriate. See *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 (2006) ("When the adequacy of the *legal* basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo.").

First, Johnson attempts to make the argument that the evidence was not offered for the truth of the matter asserted and, therefore, was not hearsay. To the contrary, the only relevance of the document was to permit Johnson to argue that the police suspected Griffin's son, Clarence, had committed the murder. Thus, the evidence was offered to prove the truth of the statement: "The victim had been stabbed to death by her son." The person that typed that statement on the form was not present and subject to cross-examination. The evidence was hearsay and could be admitted only if it met a statutory exception.

Johnson relies on the business records exception in K.S.A. 2006 Supp. 60-460(m). That exception provides:

"Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the judge finds that (1) they were made in the regular course of a business at or about the time of the act, condition or event recorded and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness." K.S.A. 2006 Supp. 60-460(m).

There was evidence adduced that the custody receipt was made in the regular course of the investigation. The evidence of the time of its preparation is somewhat ambivalent. More importantly, however, the failure of the second criterion of trustworthiness is readily apparent from the inconsistency in the actual contents of the document. The face of the receipt identifies the suspect as Johnson, while the typed narrative says that Griffin was stabbed by her son. The inconsistency in the document's contents negates any trustworthiness emanating from its preparation in the regular course of business. The district court did not err in denying admission of the document, based on defendant's failure to establish a business records exception to the hearsay rule.

## CUMULATIVE ERROR

Johnson argues that he was substantially prejudiced and denied a fair trial by the cumulative effect of the errors he asserts on appeal.

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. [Citation omitted.]" *State v. Ackward*, 281 Kan. 2, 29, 128 P.3d 382 (2006).

Considering the totality of circumstances, the minor nature of the trial errors present in this case fall well short of the fair trial denial required for reversal.

## PRO SE ISSUES

Johnson filed a pro se brief, in which he argues that the district court did not have jurisdiction; that the district court abused its discretion in denying his counsel's motion to withdraw; and that the evidence was insufficient to support his conviction. None of his claims have merit.

First, Johnson's claim that he was bound over on a charge of second-degree murder is simply belied by the record. A transcript shows that he was bound over on the amended information charging premeditated murder in the first degree.

Next, we note that the record does not contain either a journal entry or a transcript of the hearing on either Johnson's pro se motion for a new attorney or his attorney's withdrawal motion. Johnson has the burden to furnish a record which affirmatively shows that prejudicial error occurred in the district court. Without such a record, an appellate court presumes the action of the district court was proper. *State v. Holmes*, 278 Kan. 603, 612, 102 P.3d 406 (2004).

Finally, Johnson argues that the evidence only established a possibility that he committed the crime, because the forensic testing was inconclusive and the prosecution relied upon an impermissible stacking of inference upon inference. He asserts that his mere presence at the victim's house was insufficient to support the conviction.

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003)." *State v. Kesselring*, 279 Kan. 671, 679, 112 P.3d 175 (2005).

A conviction of the gravest offense may be sustained by circumstantial evidence. *State v. Dixon*, 279 Kan. 563, 621, 112 P.3d 883 (2005).

Here, the circumstantial evidence went way beyond Johnson's mere presence at the victim's house. Eyewitnesses observed him exit the house with blood on his person and clothing and anxiously urge his sister to leave the scene. Johnson left Griffin's front door open when he exited the house; the front door was still open when Clarence found the body. The victim was stabbed, and Johnson was observed earlier taking a knife from his sister's kitchen. The inferences the jury was required to draw flowed directly from proven facts. A rational jury could have reasonably found Johnson guilty, without the necessity of stacking inferences.

Affirmed.