No. 99,628

STATE OF KANSAS, *Appellee*, v. BILLY J. MCCASLIN, *Appellant*.

(245 P.3d 1030)

Opinion filed January 21, 2011.

*Janine Cox,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney,* assistant district attorney, argued the cause, and *Nola Tedesco Foulston,* district attorney, and *Steve Six,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: A jury convicted Billy J. McCaslin of first-degree premeditated murder, rape, and aggravated arson. The court sentenced him to prison without the possibility of parole for 50 years (hard 50) for the murder conviction, 246 months for the rape conviction, and 61 months for the aggravated arson conviction, with all sentences to run consecutively. Our jurisdiction of his direct appeal is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime.

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the trial court err in admitting hearsay evidence in violation of McCaslin's right to confront the witnesses against him? Not preserved for appeal.
2. Did sufficient evidence support McCaslin's convictions? Yes.
3. Did the prosecutor commit reversible misconduct? No.
4. Did the trial court err in admitting into evidence a video showing the fire department's arrival and response to the fire? No.

5. Did the trial court err in admitting into evidence a photograph of the burned house, which included the victim's burned naked body? No.
6. Did sufficient evidence support the hard 50 sentence? Yes.
7. Is the Kansas hard 50 sentencing scheme constitutional? Yes.
8. Did the trial court err by sentencing McCaslin to the aggravated terms in the sentencing grid blocks for his rape and aggravated arson convictions? No.
9. Did the trial court violate McCaslin's Sixth and Fourteenth Amendment rights when it imposed enhanced sentences without submitting the enhancing factors, *i.e.*, prior convictions, to the jury for proof beyond a reasonable doubt? No.
10. Did cumulative error deny McCaslin a fair trial? No.

Accordingly, we affirm.

## FACTS

On December 2, 2006, firefighters responded to a 911 call of a possible fire at 1701 South Laura Street in Wichita, Kansas. The house was the residence of Angela Duran-Ortiz (A.D.). Firefighters proceeded toward an orange glow coming from one of the bedrooms. Once the fire was extinguished and the smoke cleared, A.D.'s body was found on the bed. Her body was naked, except for a sock on her right foot. Her legs were spread apart and hanging over the side of the bed. A.D. was severely burned and had at least 13 visible stab or slash wounds.

McCaslin and A.D. had known each other for approximately 2½ years before her death. McCaslin dealt drugs and sold cocaine to A.D. one or two times per week. He sometimes spent the night at A.D.'s house. McCaslin said they had engaged in sexual intercourse on five previous occasions but denied that they were in a relationship.

By contrast, Luis Aguilar had known A.D. for approximately 1 week prior to her death. When A.D.'s work shift ended at midnight, Aguilar sometimes took her to her mother's house where her three children stayed. The relationship between Aguilar and A.D. was not sexual in nature.

Shortly after midnight on the morning of A.D.'s death, Aguilar picked her up from work and drove to her mother's house. Unable to find a movie to watch there, they headed to Wal-Mart. There, A.D. ignored multiple calls to her cell phone but eventually answered. After hanging up, A.D. asked Aguilar if he would go with her to pick up her friend. Aguilar agreed to pick up this unknown person. They drove to an apartment complex, and McCaslin entered the vehicle. Aguilar did not know McCaslin before this encounter. The three then went to McDonald's so A.D. could buy some food for her children. When they arrived at the mother's house with the food, A.D. told her mother that she was going to her house to pick up a movie and would return shortly.

A.D., Aguilar, and McCaslin went to A.D.'s house. Once inside, they drank beer, smoked marijuana, and snorted cocaine. When McCaslin left the house at approximately 2:30 a.m., A.D. and Aguilar remained in the kitchen and continued drinking. According to McCaslin, A.D. had asked him to buy crack cocaine and both A.D. and Aguilar gave him $20 for the purchase.

Once McCaslin left A.D.'s house, he got a ride to a pornography shop to make two drug transactions: a purchase of crack cocaine and a sale of powder cocaine. He arranged these transactions on his "Trac" phone, which he used for illegal activity.

About 1 hour later, McCaslin returned to A.D.'s house and went to a back bedroom by himself. According to McCaslin, A.D. told him to go to the bedroom so they could pretend he was waiting on a cocaine delivery and avoid sharing the drugs with Aguilar. Aguilar and A.D. remained at the kitchen table, but A.D. checked on McCaslin three or four times in the bedroom, each time returning within a minute or two. While Aguilar could not see or hear inside the bedroom, McCaslin claimed that A.D. "took hits" off a crack pipe each trip and there was some "feeling, groping, [and] a little bit of kissing, flirting around."

At approximately 5:40 a.m., Aguilar decided to leave. According to Aguilar, McCaslin was still in the bedroom and A.D. was setting up a bed on the living room couch. A.D. asked Aguilar to call her when he arrived at his parents' house. His parents heard him enter and estimated his return between 4:45 a.m. and 6 a.m. When Agui-

lar called A.D., they made plans to meet at 4 o'clock that afternoon. During the call, A.D. indicated that McCaslin was still in the bedroom.

According to McCaslin, he and A.D. engaged in consensual sexual intercourse after Aguilar left. They stayed in the bedroom for about 1 hour until A.D. got a phone call and left to talk in the front room. McCaslin decided to leave, but because A.D. was nervous and worried Aguilar would return, McCaslin offered to get his pistol for her. He got a ride to his mother's house and arranged for his father to later pick him up for work at A.D.'s house.

McCaslin testified that he returned to A.D.'s house and took off his shoes because of the snow, mud, and wet ground outside. A.D. did not answer McCaslin's calls, so he went inside. Upon reaching the bathroom, McCaslin slipped in a pool of blood but caught himself before falling to the floor. He then saw a fully-clothed A.D. on the bathroom floor. She had a knife sticking out of her chest and a handle of an unknown object sticking out of her neck.

McCaslin bent down to see if A.D. was alive, but she was nonresponsive. Because he was bloody from his contact with her body, he tried to wipe off the blood with clothes found in the house. He was unsuccessful and went to the kitchen and used some towels. He took off his clothes and changed into some of A.D.'s clothing, including a pair of women's jeans. Because he knew there was no running water in the house, he finished cleaning himself with milk. He put his bloody clothes and a "Presto" lighter into a pillow sham and went out the back door. He quickly found a trash dumpster in the alley and put the pillow sham inside.

When McCaslin was a few blocks from A.D.'s house, he called his father, who picked him up and took him to McCaslin's mother's house. There he undressed, showered, and placed the removed clothes into a bag. He rejoined his father in the truck and headed to work in Valley Center. On the way, McCaslin directed his father to the dumpster containing the pillow sham. Once there, McCaslin retrieved the pillow sham containing the bloody clothes from the dumpster.

McCaslin then directed his father to find a dumpster in Valley Center. Once there, he put both containers of clothes—the pillow

sham and the bag from his mother's house—into the dumpster. After work, McCaslin went to a Kwik Shop, where he gave his pistol, ammunition, and cocaine to a friend.

Sometime after an 11:10 a.m. call to 911 reporting smoke coming from A.D.'s house, Fire Investigator David Higday examined the scene. The position of A.D.'s body on the bed intrigued Higday because a fire victim's legs usually draw upwards rather than hang down spread apart. Fire investigators determined the fire was intentional and that A.D.'s body had been covered in an ignitable liquid.

Deputy Coroner Deborah Johnson performed A.D.'s autopsy. She concluded that the 13 stab and slash wounds were inflicted before the fire was set. Johnson also concluded that because A.D. had soot in her lungs and stomach, A.D. was still alive when the fire started. Accordingly, the official cause of death was "multiple stab wounds associated with thermal burns and soot and smoke inhalation." Subsequent vaginal swabs revealed DNA from McCaslin.

McCaslin later directed police to the pillow sham and the bag of clothes in the Valley Center dumpster.

A jury convicted McCaslin of first-degree premeditated murder, rape, and aggravated arson. The court sentenced him to prison without the possibility of parole for 50 years (hard 50) for the murder conviction, 246 months for the rape conviction, and 61 months for the aggravated arson conviction, with all sentences to run consecutively.

More facts will be added as necessary to the analysis.

## ANALYSIS

*Issue 1: McCaslin's confrontation and hearsay arguments were not preserved for appeal.*

McCaslin first argues the trial court admitted hearsay evidence in violation of his Sixth Amendment right under the United States Constitution to confront the witnesses against him. See *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The State responds that he has not preserved these evidentiary questions for our review.

On direct-examination, McCaslin testified that he engaged in sexual relations with A.D. five times in the past 2 years but maintained they were not in a relationship. During the State's cross-examination, McCaslin's counsel objected during the following exchange:

"Q. [PROSECUTOR:] Are you aware that [A.D.'s] friend said—you would not be aware because it's not in the police reports that she said she would never— she never would have had sex with you?

"[DEFENSE ATTORNEY]: Objection, Your Honor. He is [sic] stating facts not in evidence.

"[PROSECUTOR]: I'm asking if he's aware of that.

"[DEFENSE ATTORNEY]: And again—

"THE COURT: Overruled. You can answer the question.

"A. [MCCASLIN:] I've read the reports. I've read a lot of things in them reports."

McCaslin's motion for a new trial changed his basis for objecting from assuming facts not in evidence to (1) hearsay and (2) Confrontation Clause violations. The trial court denied the motion and found any error to be harmless. In relevant part, the judge said:

"Bottom line in my opinion is that the question was an inartfully asked question. The response to the question was nonresponsive because the question wasn't artfully drafted or asked rather. I probably at that point should have just over— sustained the objection based on the form of the question, but at the end of the day it seems to me that what Mr. O'Connor [the prosecutor] was asking Mr. McCaslin is whether or not he was aware that certain friends of the victim held the opinion that the victim would never have slept with him. .

. . . .

"In any event, it was never the opinion—evidence was never offered, but at the same time the subject was never brought up again during the entire course of the trial. And I'm unable to rule that this isolated reference to opinion evidence had any bearing on the jury's verdict especially in light of the evidence of the defendant's guilt which I summarized on my ruling on the motion for acquittal.

"I guess the bottom line on that issue is that it was a bad question. The answer to the question was not responsive. The subject matter of the question was never raised again either in the cross-examination of the defendant, in the examination of the other witnesses or during the closing argument presented by the State so I don't think it had any bearing on the outcome of the trial."

We have long recognized the general rule that "a party cannot raise an issue on appeal where no contemporaneous objection was made and where the trial court did not have an opportunity to

rule." *State v. Kirtdoll*, 281 Kan. 1138, 1148, 136 P.3d 417 (2006); see, *e.g.*, *State v. Yarrington*, 238 Kan. 141, 145, 708 P.2d 524 (1985).

Our recent decision in *State v. King*, 288 Kan. 333, 204 P.3d 585 (2009), reaffirmed our commitment to the requirement that, pursuant to K.S.A. 60-404, "evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." 288 Kan. at 349. In *King*, the defendant failed to object during trial to the prosecutor's cross-examination of him. We refused to consider the alleged constitutional violation asserted for the first time on appeal: the prosecutor's use of defendant's postarrest silence to impeach defendant's credibility in violation of the Fifth and Fourteenth Amendments to the United States Constitution as prohibited in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

In *King* we distinguished between evidentiary claims, for which a specific trial objection is required to preserve the issue for appeal, and prosecutorial misconduct claims, for which no objection is required at all. We noted that, like the instant case, a prosecutor's questions themselves can be considered evidentiary. "[A] prosecutor's questions during the examination of a witness—even when these questions lead to a potential *Doyle* violation—fall under the evidentiary umbrella." 288 Kan. at 347. We concluded:

"[I]n accordance with the plain language of K.S.A. 60-404, evidentiary claims—including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal." 288 Kan. at 349.

Additionally, as we recently recognized in *State v. Dukes*, 290 Kan. 485, 231 P.3d 558 (2010), the United States Supreme Court declared that the "defendant *always* has the burden of raising his Confrontation Clause objection" and noted that "[s]tates are free to adopt procedural rules governing objections." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 327, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). We have acknowledged that this declaration in *Melendez-Diaz* was consistent with the general rule established by K.S.A. 60-404. See *State v. Laturner*, 289 Kan. 727, 752, 218 P.3d 23

(2009); see also *State v. Mays,* 277 Kan. 359, 384-85, 85 P.3d 1208 (2004) (defendant's failure to timely object to alleged hearsay statements precludes defendant from raising issue on appeal, even where alleging violation of Confrontation Clause of Sixth Amendment).

In *Dukes,* we reaffirmed that the contemporaneous objection rule requires each party to make a specific and timely objection at trial in order to preserve evidentiary issues for appeal. See K.S.A. 60-404. The purpose of the rule is to avoid the use of "tainted evidence [and thereby] avoid possible reversal and a new trial." *Dukes,* 290 Kan. at 488 (citing *King,* 288 Kan. at 342). We have stated that "the trial court must be provided the specific objection so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error." *State v. Richmond,* 289 Kan. 419, 428-29, 212 P.3d 165 (2009). Specifically, in *Richmond* we refused to allow the defendant to object on one ground at trial and then argue another on appeal. 289 Kan. at 428-30; see *State v. Engelhardt,* 280 Kan. 113, 127, 119 P.3d 148 (2005).

Consequently, while McCaslin made a timely and specific objection of "stating facts not in evidence," it is nevertheless insufficient to preserve hearsay and confrontation issues for appeal. The three are not equivalents. In *State v. Bryant,* 272 Kan. 1204, 38 P.2d 661 (2002), defendant raised a hearsay objection at trial but on appeal instead argued violation of the Confrontation Clause. This court would not consider the confrontation argument on the merits, including in its reasons (1) the requirement that objections must "make clear the specific ground of objection" and (2) "a defendant may not object to the introduction of evidence on one ground at trial, and then assert a different objection on appeal." 272 Kan. at 1208. Moreover, as the United States Supreme Court has recently explained, the improper admission of hearsay evidence is not necessarily violative of the Confrontation Clause. See *Davis v. Washington,* 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confron-

tation Clause."); *Crawford,* 541 U.S. at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does [*Ohio v. Roberts,* 448 U.S. 56 (1980),] and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.").

As *Davis, Crawford, and Bryant* indicate, there may be some overlap of objections based upon hearsay and confrontation. Indeed, it might be argued that all statements violating the Confrontation Clause are also necessarily hearsay. But as *Bryant* makes clear, their overlap does not satisfy the specificity requirement of the objection. Similarly, there may be some overlap of objections based upon hearsay and those that "assume facts not in evidence." Indeed, it might be argued that all hearsay violations—and therefore Confrontation Clause violations—also necessarily "assume facts not in evidence." But under the rationale and holding of *Bryant,* such overlap does not satisfy the specificity requirement of the objection. McCaslin's posttrial motion for a new trial admittedly raised these specific grounds. But posttrial was too late. See *State v. Brinkley,* 256 Kan. 808, 824, 888 P.2d 819 (1995) (declining to address an evidentiary challenge raised for the first time in a posttrial motion for a new trial).

Stated another way, to comply with the contemporaneous objection requirement to preserve these two grounds for appeal, McCaslin needed to raise them timely during trial. See, *e.g., State v. Houston,* 289 Kan. 252, 270, 213 P.3d 728 (2009). The principle is clear: Specific and timely objections must be made to the trial court "so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error." *Richmond,* 289 Kan. at 429.

The specificity requirement is particularly important when a Confrontation Clause objection is warranted because the trial court would then be on notice of its obligation to follow the multistep analysis detailed in *Crawford,* and to give the prosecutor the opportunity to meet *Crawford's* requirements. See 541 U.S. at 68 (whether statement is testimonial and, if so, whether witness is unavailable and defendant had prior opportunity to cross-examine).

Similarly, when a hearsay objection is warranted, the evidence proponent could argue that the statement is not hearsay because it is not being "offered to prove the truth of the matter stated." See K.S.A. 60-460. Or, if the statement is hearsay, the proponent could argue that one or more of the numerous exceptions applies. See K.S.A. 60-460(a)-(ee). But if a different ground had been raised by the objecting party and analyzed by the trial court, the appellate court obviously has no trial court analysis in the record to review in its determination of the newly alleged hearsay or confrontation error.

Accordingly, we decline to address the merits of McCaslin's confrontation and hearsay arguments. Nor do we reach the merits of his trial objection, stating facts not in evidence, because he has not briefed or argued it on appeal. See *Richmond*, 289 Kan. at 437 (issue not briefed is deemed waived or abandoned); see also *Bryant*, 272 Kan. at 1208; (trial objection on hearsay grounds not addressed on appeal; defendant instead argued confrontation grounds).

The dissent argues that the confrontation and hearsay arguments should be addressed on appeal. In its effort to support this conclusion, it points to other situations where this court allegedly has reached decisions based upon reasons other than those argued by the parties.

We need not attempt to analyze all of the situations described by the dissent because a simple, distinguishing response suffices. That is, the limited issue before us concerns an evidentiary objection. The Kansas Legislature has established the rule for evidentiary objections by statute. The legislature, not this court, requires that the objection at the trial court to the admission of evidence "make clear the *specific* ground of objection." (Emphasis added.) K.S.A. 60-404. Otherwise, the verdict cannot be set aside. 60-404. Under the separation of powers doctrine, this court has no constitutional authority to essentially negate the legislature's decision to require a specific ground of objection in the trial court by then allowing a *different* objection to be argued in the appellate court. See *State v. Freeman*, 195 Kan. 561, 564, 408 P.2d 612 (1965) (K.S.A. 60-404 has a legitimate purpose for the appellate court,

whose function is that of review rather than trial de novo.) Per the dissent's rationale, one need only make generic relevancy objections at trial and then raise a myriad of specific, legally precise bases on appeal.

On a related point, the dissent suggests it needed no presentation to the trial court of the evidentiary based arguments that were raised for the first time on appeal: hearsay and Confrontation Clause, *e.g.*, whether a statement was testimonial. The dissent implies the appellate court is in as good a position as the trial court to make these determinations. However, arguing the specific evidentiary bases at the trial court gives that court the opportunity to consider the evidence in light of these particular bases. Just as important, it gives the parties the opportunity to make their full record—on these bases—for appeal. Per the dissent's rationale, an appellate court is placed in the difficult position of hearing brand new arguments based upon a record that most likely was not developed with those new arguments in mind.

Issue 2: *Sufficient evidence supports McCaslin's convictions.*

McCaslin argues that his murder and aggravated arson convictions were premised upon the rape conviction. He reasons that once the rape conviction fails for insufficient evidence, then the aggravated arson and murder convictions must also fail.

Our standard of review on this issue is well known:

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' " *State v. Drayton*, 285 Kan. 689, 710, 175 P.3d 861 (2008).

During our review, we do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2004). Moreover, a conviction of even the gravest offense " 'can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom.' " *Drayton*, 285 Kan. at 711 (quoting *State v. Bird*, 240 Kan. 288, 299, 729 P.2d 1136 [1986], *cert. denied* 481 U.S. 1055 [1987]); *State v. Garcia*, 285 Kan. 1, 22, 169 P.3d 1069 (2007). If an infer-

ence is a reasonable one, the jury has the right to make the inference. *Drayton*, 285 Kan. at 711 (quoting *State v. Ordway*, 261 Kan. 776, 804, 934 P.2d 94 [1997]).

We address each conviction in turn.

*Rape Conviction*

Rape, as charged in this case, is defined as sexual intercourse with a person who does not consent to the sexual intercourse when the victim is overcome by force or fear. K.S.A. 21-3502(a)(1)(A). Sexual intercourse is "any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." K.S.A. 21-3501(1).

McCaslin admitted to having sexual intercourse with A.D. He argues, however, that insufficient evidence was presented showing the intercourse was not consensual. The State responds that even without the testimony of A.D., sufficient evidence supported the jury's verdict.

We agree that sufficient evidence existed for a rational jury to find McCaslin guilty of rape beyond a reasonable doubt. When viewing the evidence in the light most favorable to the prosecution, a jury could reasonably infer that McCaslin had sexual intercourse with A.D. and that it had been accomplished by force or fear.

First, sufficient evidence exists that A.D. was raped. Vaginal swabs revealed McCaslin's DNA inside of her. She was found naked on a bed with her legs spread and hanging down. Coroner Johnson testified that this tableau contained a sexual component since a fire victim's flexor muscles usually draw upwards, which produces a fetal-like position with raised legs. He therefore opined that something had been holding A.D.'s legs down. While there was no visible evidence of vaginal trauma, Johnson testified that unconscious or physically powerless victims suffering a sexual assault will not likely exhibit signs of injury. In addition to A.D.'s body position, the evidence showed that she was stabbed before her clothes were removed; her clothing was bloody, and her bra and shirt had been cut numerous times.

Second, sufficient evidence exists to establish that McCaslin was the rapist. As mentioned, vaginal swabs revealed McCaslin's DNA was inside A.D. He admitted to having sexual intercourse with her. His jeans had unusual bloodstain patterns; blood was found on the inside rear waistband as well as around the ankles. The prosecutor argued that McCaslin could only get blood there from having his jeans around his ankles, probably while he pressed up against A.D.'s bleeding body, *i.e.*, having intercourse.

### First-degree Murder Conviction

Murder in the first degree is defined as the "killing of a human being committed intentionally and with premeditation." K.S.A. 21-3401(a). The trial court instructed the jury that premeditation is "to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act." This instruction is consistent with our jurisprudence. See *State v. Jones,* 279 Kan. 395, 402, 109 P.3d 1158 (2005) (citing *State v. Scott,* 271 Kan. 103, 108, 21 P.3d 516 [2001]) (defining premeditation as "the process of thinking about a proposed killing before engaging in the homicidal conduct"); PIK Crim. 3d 56.04(b).

McCaslin does not advance any substantive arguments specific to the murder conviction; rather, he reasserts the "house of cards" analogy. He contends that because the murder was allegedly committed to cover up the rape and since insufficient evidence supports the rape conviction, this court must reverse the murder conviction.

The State responds that McCaslin's brief does not directly challenge the murder conviction and, thus, McCaslin abandoned this challenge. In support, the State cites *State v. Gardner,* 10 Kan. App. 2d 408, 701 P.2d 703, *rev. denied* 237 Kan. 888 (1985), and *Brubaker v. Branine,* 237 Kan. 488, 701 P.2d 929 (1985).

In *Gardner,* the defendant questioned the validity of a jail cell search but did not discuss the issue in his brief. The court noted that "[a]n issue which is not briefed is deemed abandoned." 10 Kan. App. 2d at 413. In *Brubaker,* we refused to review a trial court's action regarding contractual obligations because the challenging party did not raise the action as an issue on appeal. We

noted that incidentally mentioning an issue in the brief was insufficient to preserve it for appeal.

McCaslin's brief accomplishes more than those in *Gardner* and *Brubaker*. An entire section is devoted to discussing the evidence produced at trial and the State's theory on the interconnectivity between these crimes. Moreover, McCaslin specifically refers to each of the three convictions within this section. While the analysis is not in depth, it is sufficient to preserve the issue for our review.

We conclude that sufficient evidence existed for a rational jury to find McCaslin guilty of first-degree murder beyond a reasonable doubt. When viewing the evidence in the light most favorable to the prosecution, a jury could reasonably infer that McCaslin had killed A.D. intentionally and with premeditation. Among other things, phone records and Aguilar's testimony place McCaslin at or near A.D.'s house when she was killed. McCaslin admitted finding A.D.'s body in the bathroom and placing his arm on her to check for signs of life. He testified that he either slipped or fell in the pool of her blood upon entering the bathroom. Nevertheless, the jury could reasonably infer that the presence of A.D.'s blood on the inside rear waistband of his jeans most likely would not have resulted from either of those innocent actions. Moreover, his testimony that he found her fully clothed on the floor of the bathroom could be characterized by a rational jury as irreconcilable with the firefighters' testimony that she had been found, essentially nude, on her bed. Similarly, his testimony that A.D. was dead when he found her in the bathroom before the fire could be characterized by a rational jury as irreconcilable with the coroner's testimony that A.D. was alive, but wounded, when the fire was set because soot was in her lungs and stomach, indicating inhalation during the fire.

Additionally, after discovering A.D.'s body, McCaslin did not call 911. He instead took numerous steps to conceal his presence at the scene. He removed his bloody clothes, cleaned her blood from his body, changed into other clothes, and hid his bloody ones, plus his lighter, in a pillow sham, which he then hid in a nearby dumpster. When he got to his mother's house he removed the second set of clothes, showered, changed into clean ones, and then hid the others in a bag. He then retrieved his original bloody clothes and

lighter he had hidden in the dumpster near A.D.'s house and, together with the second set of clothes hidden in the bag, hid all in a different dumpster in a different town. That same day he also got rid of his pistol, ammunition, and drugs. See *State v. Sanchez-Cazares*, 276 Kan. 451, 459, 78 P.3d 55 (2003) (premeditation may be inferred by a defendant's behavior before and after the killing).

### Aggravated Arson Conviction

Arson is "knowingly, by means of fire or explosive: damaging any building or property which is a dwelling in which another person has any interest without the consent of such other person." K.S.A. 21-3718(a)(1)(A). Aggravated arson is "arson, as defined in K.S.A. 21-3718 . . . committed upon a building or property in which there is a human being." K.S.A. 21-3719(a)(1).

Similar to the murder conviction, McCaslin does not advance substantive arguments in his brief. Instead, he primarily contends that the aggravated arson conviction was premised on the rape conviction and must fail because the latter conviction was not supported by sufficient evidence. The State again contends that McCaslin insufficiently addresses this issue. We disagree with the State's argument for the same reasons concerning the first-degree murder conviction.

We conclude that sufficient evidence existed for a rational jury to find McCaslin guilty of aggravated arson beyond a reasonable doubt. When viewing the evidence in the light most favorable to the prosecution, a jury could reasonably infer that McCaslin had knowingly set fire to A.D.'s house, with her inside, without her consent.

When McCaslin left A.D.'s house for the final time the morning of her death, it was not visibly burning. He admitted he was a few blocks from her house when he received a ride from his father; phone records establish that his father had called him at 9:07 a.m. to arrange that ride. 911 was called approximately 2 hours later to report the fire. Lieutenant Hurd testified that when emergency crews responded the fire had already been burning for a long time because it had burned through the floor, the floor joists, and a wall. While no witnesses actually saw McCaslin light the fire, he put a

"Presto" brand lighter in the pillow sham with his bloody clothes, which he hid in the nearby dumpster as soon as he left the house. Finally, McCaslin claimed that A.D. was dead when he found her in the bathroom before the fire. But the coroner opined that she was alive, but wounded, when the fire was set.

Issue 3: *The prosecutor did not commit reversible misconduct.*

McCaslin alleges three separate instances of prosecutorial misconduct. First, he claims the prosecutor continually badgered him during cross-examination. Second, he alleges the prosecutor's question regarding the opinion of A.D.'s friend, as addressed in Issue 1, was improper and resulted in a violation of his right to confrontation. Third, McCaslin claims the prosecutor's statements during rebuttal closing argument were inflammatory and improper. The State denies that the prosecutor's efforts constituted misconduct.

Our standard of review for allegations of prosecutorial misconduct is well established:

"Allegations of prosecutorial misconduct require a two-step analysis. First, the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal. *State v. Elnicki*, 279 Kan. 47, 58, 105 P.3d 1222 (2005) (quoting *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 [2004]). We have applied the test to prosecutorial action in contexts beyond mere comment on the evidence. See *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006) (citing cases)." *State v. White*, 284 Kan. 333, 337-38, 161 P.3d 208 (2007).

We have provided specific guidance on when to grant a new trial on this basis:

"In the second step of the two-step prosecutorial misconduct analysis, the appellate court considers three factors to determine whether a new trial should be granted: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman*

*v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial) have been met." *State v. Bryant,* 285 Kan. 970, Syl. ¶ 2, 179 P.3d 1122 (2008).

We review each claim of misconduct in turn.

*Badgering during cross-examination*

McCaslin argues that the prosecutor badgered him during cross-examination. The State paints the episode as a fair cross-examination of a combative and uncooperative witness.

During trial, the prosecutor's cross-examination of McCaslin developed into a heated exchange. The court took a recess to instruct the parties and witness on how to conduct the remainder of the examination.

McCaslin cites various portions of the examination, including the following:

"[PROSECUTOR:] Mr. McCaslin, there is blood on the back here which is on the rear of your pants on the inside. Is that a soak through, too, Mr. McCaslin?

"[MCCASLIN:] It looks like a soak through to me. How else would it get there?

"[PROSECUTOR:] Well, it would get there by you having your pants down around your waist and pressing your body up against a woman who is bleeding.

"[MCCASLIN:] No, you are wrong.

"[PROSECUTOR:] It wouldn't?

"[MCCASLIN:] If I was pressing my body up against a woman, why would the blood stains be on the back of the pants—

"[PROSECUTOR:] Because the pants are—

"[MCCASLIN:] —on the inside?

"[PROSECUTOR:] Because the pants are down around your ankles, Mr. McCaslin, because you were raping her.

"[MCCASLIN:] Oh, is that right?

"[PROSECUTOR:] Well explain to us how it gets back there.

"[MCCASLIN:] I've already explained it to you.

"[PROSECUTOR:] You are a blood expert now?

"[MCCASLIN:] Are you?

"[DEFENSE ATTORNEY:] Your honor—

"[PROSECUTOR:] You act like—

. . . .

"A. [MCCASLIN:] Well, you weren't there. I was. How many bodies have you walked in on like that?

"Q. [PROSECUTOR:] Mr. McCaslin, you've walked in on more bodies like that than I have.

"[DEFENSE COUNSEL]: Objection.
"[MCCASLIN:] Well, you are assuming that I have.
"[DEFENSE COUNSEL]: Objection, Your Honor.
"THE COURT: Well—
"[PROSECUTOR]: He's already said he was there, Judge.
"THE COURT: Nonresponsive answer to the question. Let's get back to the question/answer format."

On at least two occasions, the prosecutor reminded McCaslin that the prosecutor, not McCaslin, was asking the questions on cross-examination. In partial response to McCaslin's allegations of prosecutorial misconduct, the State points out that McCaslin *sua sponte* attempted, on several occasions, to stand up and demonstrate events to the jury.

As evidenced by the following authorities, we conclude the prosecutor engaged in conduct inconsistent with a servant of the law and a representative of the people of Kansas, *i.e.*, misconduct. See *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321(2000); *State v. Bryant*, 285 Kan. 970, 978-79, 179 P.3d 1122 (2008). While McCaslin was admittedly evasive and often combative in his answers, Kansas prosecutors are held to higher standards than criminal defendants. For example, while McCaslin admittedly asked the prosecutor how many bodies the prosecutor had walked in on like that, we see no valid reason, or evidentiary basis, for the prosecutor to respond that McCaslin has "walked in on more bodies like that than I have." See Rule 3.4(e) of Supreme Court Rules Relating to Discipline of Attorneys (KRPC) ("A lawyer shall not . . . (e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence.") (2010 Kan. Ct. Annot. 552); *State v. Tosh*, 278 Kan. 83, 88, 91 P.3d 1204 (2004). Additionally, the prosecutor's response appeared to suggest that McCaslin was a disreputable character and, perhaps, had even killed like this before.

In *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009), we stated: "When a prosecutor argues facts that are not in evidence, this court has consistently found that 'the first prong of the prosecutorial misconduct test is met.'" See *State v. Ly*, 277 Kan. 386, Syl. ¶ 4, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004) (statement

made in closing argument not supported by evidence at trial; court proceeded to second step in prosecutorial misconduct analysis: whether statement constituted plain error); *State v. Gardner*, 264 Kan. 95, 106-07, 955 P.2d 1199 (1998) (same).

In *State v. Smith*, 258 Kan. 321, 323-24, 904 P.2d 999 (1995), after noting Rule 3.4(e), we held that the prosecutor's reference to the Bible in his question during cross-examination of defendant was "clearly improper," but not reversible, conduct. In *Tosh*, 278 Kan. at 86, we reviewed the prosecutor's question during cross-examination of a defense witness: " 'Well, we've rested our case, so we've proven that he raped his daughter, kidnapped his daughter and raped her again. You're aware of that, right?' " Defense counsel objected. We held that "[a]lthough not directed to the jury, it was obviously an attempt to prejudice the defendant and constitutes prosecutorial misconduct." 278 Kan. at 87.

Now that we have established the existence of prosecutorial misconduct, we proceed to step two of the analysis: whether the misconduct was of sufficient magnitude to require reversal and a new trial. *White*, 284 Kan. at 340; *State v. Elnicki*, 279 Kan. 47, 64, 105 P.3d 1222 (2005). We hold that the prosecutor's conduct was gross and flagrant. While a close question, we hold that it was not motivated by the prosecutor's ill will. We acknowledge he was dealing with a difficult witness and responding to questions asked by McCaslin. Indeed, during the hearing on the motion for new trial, the prosecutor admitted that "I've been doing this [prosecuting] for quite some time and there isn't any more belligerent defendant that I've ever cross-examined than Mr. McCaslin."

Whether this otherwise constituted reversible misconduct, *i.e.*, after reviewing the amount of the evidence in light of the state and federal standards, as articulated in *Tosh*, will be discussed later in the opinion.

*Violation of McCaslin's right to confrontation*

McCaslin also claims the prosecutor committed misconduct with a specific question asked during his cross-examination of McCaslin. As set forth in Issue 1, the prosecutor asked McCaslin, "Are you aware that [A.D.'s] friend said . . . she never would have had sex

with you?" Defense counsel objected on the grounds of "stating facts not in evidence" and was overruled.

Borrowing its argument from the evidentiary context in Issue 1, the State asserts that McCaslin failed to preserve this misconduct claim for appeal. More particularly, the State appears to again argue that McCaslin improperly has changed his trial objection—stating facts not in evidence—to now argue confrontation as his basis. After carefully reviewing McCaslin's brief, we conclude his purported change is not as straightforward as the change in Issue 1.

In *King*, 288 Kan. at 346-49, we held that a failure to timely and specifically object under K.S.A. 60-404 to a prosecutor's questions that are truly evidentiary could not be disregarded even when the issue had been characterized by defendant as prosecutorial misconduct. However, here McCaslin did object at trial. Moreover, we conclude he has not changed his objection on appeal for the misconduct claim. According to his brief, "[T]he prosecutor introduced evidence of statements made by individuals who were not called to testify." We acknowledge that after stating the prosecutor's full question, McCaslin then mentioned a violation of his right to confront the witnesses against him. However, we do not interpret his argument to be that a confrontation violation now serves as the basis for his appellate objection; rather, the violation was the result of the evidence's admission over his objection. While a close call, we hold that this prosecutorial misconduct claim is premised on the prosecutor's "assuming facts not in evidence," a basis which was not abandoned or changed on appeal. Accordingly, the issue of prosecutorial misconduct is preserved.

We begin our analysis on the merits by noting that the friend, or friends, were never identified, much less called to testify, contrary to KRPC Rule 3.4(e) ("A lawyer shall not . . . (e) in trial, allude to any matter that . . . will not be supported by admissible evidence."). See *State v. Cravatt*, 267 Kan. 314, 330, 979 P.2d 679 (1999) (A prosecutor "may not make assertions of fact in the form of questions to a witness absent a good faith basis for believing the asserted matters to be true.").

We acknowledge the trial court's overruling of McCaslin's objection could have led the prosecutor to briefly forego providing the usual good-faith evidentiary basis for the question. While the prosecutor eventually alleged a good-faith basis in the hearing on McCaslin's motion for new trial, the problem is the jury never heard a good-faith basis for his question. "By asking questions that have no basis in fact, the questioner can leave in the minds of the jurors all kinds of damaging and prejudicial but false or inadmissible facts, facts which can't be adequately rebutted by witness' testimony or instructions by the court." *State v. Holsinger*, 124 Ariz. 18, 21, 601 P.2d 1054 (1979).

A prosecutor is not just an advocate. See *Pabst*, 268 Kan. at 510. As we stated in *State v. Gonzales*, 290 Kan. 747, 760, 234 P.3d 1 (2010):

"The prosecutor's role in our criminal justice system is unique, and it carries concomitant responsibilities. The prosecutor is a representative of the government in an adversary criminal proceeding, which means he or she must be held to a standard not expected of attorneys who represent 'ordinary' parties to litigation."

We went on to say in *Gonzales*: "The comments to KRPC 3.8, Comment [1] (2010 Kan. Ct. R. Annot. 565) make this explicit: 'A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.'" 290 Kan. at 761; see also *Berger v. United States*, 295 U.S. 78, 87-88, 55 S. Ct. 629, 79 L. Ed. 1314 (1934), *overruled on other grounds Stirone v. United States*, 361 U.S. 212, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960) (Because the prosecutor "is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer[,] . . . [i]t is as much his duty is to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."). On a more fundamental, and critical, level, the prosecutor's question also did not call for, and could not have engendered, a substantive response from McCaslin. The prosecutor himself essentially admitted that McCaslin could not respond:

"Q. [PROSECUTOR:] Are you aware that [A.D.'s friend] said—*you would not be aware because it's not in the police reports that she said she would never*—she never would have had sex with you?" (Emphasis added.)

Despite admitting that McCaslin could not respond because McCaslin "would not be aware" that the friend said A.D. never would have had sex with him, the prosecutor nevertheless persisted in demanding a McCaslin response, *i.e.*, "if he *was* aware."

"[DEFENSE ATTORNEY]: Objection, Your Honor. He's stating facts not in evidence.

"[PROSECUTOR:] I'm asking *if he's aware of that*." (Emphasis added.)

In short, the fact of McCaslin's awareness could not be proven through McCaslin. And the prosecutor knew it. See ABA Standards for Criminal Justice: Prosecution Function and Defense Function, Standard 3-5.6(b) (3d. ed. 1993) ("A prosecutor should not knowingly and for the purpose of bringing inadmissible matter to the attention of the . . . jury . . . ask legally objectionable questions."). *Tosh* again provides guidance. There, we reviewed the prosecutor's questions during cross-examination of Tosh, which suggested the defendant had told his wife that he was guilty or was going to plead guilty. Citing KRPC 3.4(e), we found no good-faith basis for the questions because the State had never supplied a factual basis for them or argued there was one. Despite the lack of defense objection to the questions—which today *King* would find fatal—we held that the cross-examination of defendant was inflammatory, egregious, and prejudicial. In other words, it was prosecutorial misconduct. 278 Kan. at 89, 93.

For all of these reasons, we easily conclude the prosecuting attorney engaged in misconduct during this episode. We now proceed to step two of the analysis.

After reviewing the record, we simply are aware of no legitimate reason for this question by the prosecutor. The jurors were informed by the prosecutor, without evidence, that the rape and murder victim never would have had sex with McCaslin. The inference by the jury is clear: McCaslin's testimony about consensual sex the morning of her death should not be believed. While the trial court's overruling of McCaslin's objection could have led the prosecutor to believe no good-faith basis for the question needed to be shown at that time, none was ever shown during trial. Moreover, the prosecutor's reference to this purported evidence became

particularly troubling when coupled with his acknowledgment that McCaslin would not be aware of its existence, *i.e.*, it was impossible to prove through McCaslin. In this respect, the conduct could be considered worse than the prosecutor's cross-examination of the defendant in *Tosh*. Accordingly, we agree with McCaslin that this question demonstrated ill will, lack of good faith, and was gross and flagrant. See *Tosh*, 278 Kan. at 93-95. Whether this otherwise constituted reversible conduct, *i.e.*, after reviewing the amount of the evidence in light of the state and federal standards, will be discussed later in the opinion.

### *Prosecutor's rebuttal remarks*

Finally, McCaslin argues that the prosecutor inflamed the emotions and passions of the jury during his rebuttal remarks. The State responds that the arguments were within a prosecutor's latitude.

As a fundamental rule in closing arguments, prosecutors must confine their comments to matters in evidence. *State v. Richmond*, 289 Kan. 419, 440-41, 212 P.3d 165 (2009) (citing *State v. Baker*, 281 Kan. 997, Syl. ¶ 11, 135 P.3d 1098 [2006]). However, a prosecutor is allowed considerable latitude in discussing the evidence and drawing reasonable inferences from that evidence. *Richmond*, 289 Kan. at 440-41; see also *King*, 288 Kan. at 352 (" 'Inherent in this wide latitude is the freedom to craft an argument that includes reasonable inferences based on the evidence.' "). We have held that a prosecutor is given wide latitude in the language and manner of presenting argument and may even use picturesque speech as long as he or she does not refer to facts not disclosed by the evidence. *State v. Rodriguez*, 269 Kan. 633, 643-45, 8 P.3d 712 (2000) (discussing cases referring to the "smoke and mirrors" analogy).

McCaslin complains two prosecutorial comments were improper. First, evidence showed that A.D.'s body was set ablaze after she was doused with citronella oil. When explaining why there was no citronella oil on McCaslin, the prosecutor argued to the jury:

"You've all maybe lit a barbecue. Did you get barbecue lighting fluid on you when you are lighting a barbecue? No, it goes on the charcoal, and Angela Duran was his charcoal and he was through."

Second, when explaining to the jury why there was no soot on McCaslin's clothing, the prosecutor remarked:

"We're not saying he hung around and cooked s'mores. We're saying he lit the fire and left. The fire was burning. You would not have soot, you would not have ash, you wouldn't have smoke at the time."

The State responds that the prosecutor was merely discussing the evidence and drawing an analogy to explain it.

We acknowledge that the prosecutor's statements served to explain two important factual issues in the case: why the accelerant used to set A.D. on fire was not found on McCaslin and why McCaslin's clothing did not contain ash or soot if he was at the fire. We also recognize that both of these issues were raised in the defense's closing argument, *i.e.*, the materials' absence indicated McCaslin's innocence. This in turn caused the prosecutor to address them in rebuttal. The language chosen created an analogy easily understood by the jury and did not contain facts undisclosed by the evidence.

However, comparing a burning murder victim to the lit charcoal for barbecuing meat and for roasting marshmallows to make a cookout dessert falls short of qualifying the prosecutor as a paragon of professionalism. The reference which can imply roasting marshmallows over A.D.'s flaming body, while picturesque (see *Rodriguez*, 269 Kan. at 643), is particularly repugnant. We agree with McCaslin that these remarks not only constituted prosecutorial misconduct but also demonstrated ill will, lack of good faith, and were gross and flagrant. See *Elnicki*, 279 Kan. at 64.

Despite our disapproval of this language, we are not prepared to find reversible error, even when coupled with the prosecutor's instances of misconduct during McCaslin's cross-examination. When viewed against other evidence in the case, the prosecutor's conduct did not deny McCaslin a fair trial. See *Richmond*, 289 Kan. at 444-45. We hold that the harmlessness standards are satisfied from both K.S.A. 60-261 (not inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967) (conclude beyond reasonable doubt that the error had little, if any, likelihood of having

changed the results of the trial). See *State v. White*, 284 Kan. 333, 340, 161 P.3d 208 (2007).

For example, although reviewed under a different standard in Issue 2, much of the same evidence applies to the present analysis. After discovering A.D.'s body, McCaslin did not call 911. By his own admission, he instead took numerous steps to conceal his presence at the scene. That same day he also got rid of his pistol, ammunition, and drugs. McCaslin's claim of innocence was additionally harmed by the location of A.D.'s blood on the inside of his jeans' waistband, the condition and position of A.D.'s body, his DNA inside her, and the proximity in time between his now admitted presence at the scene and the house fire. Moreover, key parts of his testimony were irreconcilable with the testimony of both the coroner and the fire investigator after their independent reviews of A.D.'s body.

## Issue 4: *The fire department video was properly admitted.*

Next, McCaslin argues that the trial court erred in admitting and playing for the jury an 8-minute fire department video that showed the department's response to the 911 call. He claims it was irrelevant, cumulative, and more prejudicial than probative. The State responds the tape was correctly admitted.

The video, filmed by a fire recruit, begins as the fire engine is driving to A.D.'s house. Once the crew arrives, the video focuses primarily on the outside of the house and shows firefighters breaking windows, entering the house, and extinguishing the fire. The recruit never enters the house. When it shows smoke coming from the windows and vents, however, a portion of A.D.'s leg on the bed is visible for a matter of seconds.

Our review of this issue is well known:

"When a party challenges the admission or exclusion of evidence on appeal, the first inquiry is relevance. [Citation omitted.] Unless otherwise prohibited, all relevant evidence is admissible. [Citation omitted.] 'Relevant evidence' is 'evidence having any tendency in reason to prove any material fact.' [Citation omitted.]" *State v. Walters*, 284 Kan. 1, 8, 159 P.3d 174 (2007).

To establish relevance, there must be some logical connection between the asserted facts and the inference or result they are

intended to establish. *State v. Houston*, 289 Kan. 252, 261, 213 P.3d 728 (2009); *Richmond*, 289 Kan. at 437.

" 'Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question.' [Citation omitted.]" *Walters*, 284 Kan. at 8.

Our review of McCaslin's arguments is for abuse of judicial discretion. *State v. Reid*, 286 Kan. 494, 512, 186 P.3d 713 (2008) (reviewing for probativity; balancing probativity with prejudice); *State v. Torres*, 280 Kan. 309, 333, 121 P.3d 429 (2005) (reviewing for cumulative).

McCaslin claims the video is not relevant because watching firefighters respond to a fire, which is not in dispute, adds nothing to the jury's knowledge and understanding of the charges filed. He contends that the video only served to inflame the passions and prejudice of the jury and showing A.D.'s burned body justified excluding the video.

The State responds that the video aided the jury in understanding the testimony of fire investigators. It contends that while A.D.'s body was visible, the extremely short duration and low visibility through the smoke negates the potential for undue prejudice.

Before trial, the district court watched the video and overruled the defense's objection. Among other things, the judge stated the video was not unduly prejudicial:

"I think as to the issue of the portions of the video which depict the body, . . . the body is inside the house, the lighting in the house is darker than the outside. There is smoke in the way.

"Honestly had the parties not pointed out to me that's what I was looking at when I saw the video, I would not have recognized that portion of the thigh as being part of any body at all, so I think in light of the photographs that the parties have agreed come in, the portion of the video which shows the thigh of the victim is not unduly prejudicial, nor unduly graphic."

In *State v. Parker*, 277 Kan. 838, 89 P.3d 622 (2004), the jury was shown photographs and a video of the townhouse where the crime was committed. We determined that the "videotape of the townhouse was useful, but certainly not essential, for acquainting the jurors with the scene of the crime. Our case law, however,

requires only usefulness." 277 Kan. at 848. Similarly, in *State v. Kunellis*, 276 Kan. 461, 482, 78 P.3d 776 (2003), a police dashboard videotape was properly shown to the jury "to show that a violent automobile accident occurred" and it "confirmed aspects of the testimony of several key witnesses to the accident scene."

We conclude that the video was relevant because it assisted the jury in understanding the testimony of multiple witnesses. It allowed the jurors to see smoke coming from the house; to see the fire damage, which helped jurors understand Lieutenant Hurd's testimony that the fire burned for a long time; to see the disarray inside the house, which was later introduced in photographs; and to see the efforts taken to suppress the fire. While a portion of A.D.'s body was visible for 2-3 seconds, its appearance was not unduly prejudicial, especially in light of the numerous photographs of her body admitted without objection. Finally, although some of the same information was presented through other evidence, the video also contained additional information; we hold it was not excessively cumulative. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the video into evidence.

**Issue 5:** *A photograph of the burned house was properly admitted.*

McCaslin challenges the admission of State's Exhibit 29, a photograph taken from inside the bedroom, which shows A.D.'s naked, burned body. He argues the photograph is unduly graphic and more prejudicial than probative. The State contends that this issue was not preserved for appeal because there was no contemporaneous objection during trial.

We explained the contemporaneous objection requirement in Issue 1. Moreover, when, as here, a pretrial motion to suppress evidence has been denied, "the moving party must object to the admission of the evidence at the time it is offered during trial to preserve the issue for appeal." *Houston*, 289 Kan. 252, Syl. ¶ 10. In *Houston*, we referenced *State v. Jones*, 267 Kan. 627, 637, 984 P.2d 132 (1999):

"In *Jones*, the defendant argued that his counsel's action at the beginning of trial to renew his previous motions to suppress was the equivalent of a timely

interposed objection to evidence when it was offered later during trial. The court rejected this argument, [citation omitted], for 'why nothing short of an objection at the time evidence is offered satisfied the requirement' of a contemporaneous objection." 289 Kan. at 270 (quoting *Jones*, 267 Kan. at 637).

The court denied McCaslin's pretrial motion to exclude the fire department video and Exhibit 29. His counsel asked for and was granted a continuing objection specific to the fire department video, but requested no continuing objection for Exhibit 29. At trial, the prosecutor offered State's Exhibits 7 through 48 into evidence at the same time, and the defense did not object. Furthermore, after their admission, Fire Investigator Higday discussed the contents of each photograph individually. When he arrived at Exhibit 29, the photograph of A.D.'s body, the prosecutor published it to the jury and discussed it, again without objection.

We conclude that McCaslin's failure at trial to renew the objection contained in his pretrial motion to suppress violates the contemporaneous objection rule. The failure precludes our review of the admissibility of Exhibit 29.

Issue 6: *Sufficient evidence supports the hard 50 sentence.*

McCaslin claims that insufficient evidence exists to support the two aggravating circumstances the trial court relied upon when imposing the hard 50 sentence: (1) he committed the crime in an especially heinous, atrocious, or cruel manner; and (2) he committed the crime in order to avoid or prevent a lawful arrest or prosecution. The State responds that considerable evidence supports the court's determination.

Our standard of review for this issue is as follows:

" ' " 'When a defendant challenges the sufficiency of evidence establishing the existence of an aggravating circumstance in a hard 50 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence.' " ' [Citation omitted.]" *Reid*, 286 Kan. at 524.

Hard 50 sentencing is authorized by K.S.A. 21-4635, "which requires the court to weigh evidence of any mitigating circumstances against evidence of any aggravating circumstances." *State v. Baker*,

281 Kan. 997, 1018, 135 P.3d 1098 (2006). While the trial court found two of the aggravating circumstances identified in K.S.A. 21-4636, the court found no mitigating circumstances. And McCaslin asserts none on appeal.

When determining whether sufficient evidence exists to support the first aggravating circumstance, that McCaslin committed the crime in an especially heinous, atrocious, or cruel manner, we observe that the trial court cited evidence indicating A.D. was alive when the fire was set. It also cited evidence that she suffered before she died; that she was stabbed approximately 13 times, including a deep slash in her throat; and that her body was desecrated, which indicates "a particular depravity of the mind." The trial court also found that the crime inflicted mental anguish or physical abuse before A.D. died.

We have held that "stab wounds inflicted to maim, torture, or inflict pain could constitute the aggravating circumstance." *State v. Johnson*, 284 Kan. 18, 27, 159 P.3d 161 (2007), *cert. denied* 552 U.S. 1104 (2008) (citing *State v. Follin*, 263 Kan. 28, 51, 947 P.2d 8 [1997]). A.D.'s 13 stab wounds were similar in nature and location to those in *Johnson*, which involved the head, upper body, and forearms—including defensive wounds. A.D. was stabbed in her throat, upper torso, left and right breasts, left bicep, left forearm, upper back, and the back of her head. Some of her wounds were defensive. See *State v. Hernandez*, 284 Kan. 74, 107, 159 P.3d 590 (2007) (defensive stab wounds supported the aggravating circumstance because they indicated a violent attack and fear in the victim).

McCaslin argues that multiple stab wounds do not necessarily constitute evidence that mental anguish was inflicted, citing *Follin*. Primarily due to the location and nature of A.D.'s stab wounds, we disagree; we follow our analysis in *Johnson*, where we rejected a similar reliance on *Follin*:

"However, we perceive the *Follin* court was persuaded by the precise manner in which the wounds were inflicted into the heart while avoiding the ribs, so as to expedite death and minimize the preceding pain and suffering. In contrast, the nature and location of [the victim's] multiple wounds suggest that they were re-

peatedly delivered in a random and forceful manner consistent with a desire to hurt the victim, rather than to effect a quick kill." 284 Kan. at 28.

Even if the stab wounds alone were insufficient to support this aggravating circumstance, the events surrounding the fire demonstrate an especially heinous, atrocious, or cruel manner. After the repeated stabbings, A.D. was covered with citronella oil, a petroleum distillate, and set on fire while still alive. The circumstances of A.D.'s murder are clearly the type that K.S.A. 21-4636(f) contemplates. See *State v. Flournoy*, 272 Kan. 784, 793, 36 P.3d 273 (2001). In short, the standards of *Reid* have been met.

We also conclude there was sufficient evidence to establish under *Reid* the second aggravating circumstance: that McCaslin murdered A.D. in order to avoid or prevent a lawful arrest or prosecution. McCaslin admitted that he had sexual intercourse with A.D.; indeed, his DNA was inside her. Therefore, consent became a primary issue for the jury. As noted in Issue 2, sufficient evidence supports the rape conviction, *e.g.*, the location and condition of A.D.'s body and her torn and cut clothing. In particular, the timing of her murder establishes, like McCaslin's setting of the fire and disposing of his lighter and two sets of clothes, that the murder was just another one of his numerous steps of avoiding arrest.

In summary, both aggravating circumstances are supported by the evidence. Because McCaslin does not advance any mitigating factors to weigh against them, the trial court properly imposed the hard 50 pursuant to K.S.A. 21-4635.

Issue 7: *The Kansas hard 50 sentencing scheme is constitutional.*

McCaslin next challenges Kansas' hard 50 sentencing scheme. He cites *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 536 (2002), *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999). He argues the statute, K.S.A. 21-4635, is unconstitutional because it does not provide a criminal defendant the right to have a jury determine beyond a reasonable doubt all the facts that might increase the maximum penalty for first-degree murder. The State responds that we have rejected this argument previously.

We review constitutional questions de novo. *State v. Kirtdoll*, 281 Kan. 1138, 1151, 136 P.3d 417 (2006); *State v. Oliver*, 280 Kan. 681, 707, 124 P.3d 493 (2005).

As the State suggests, we have rejected this identical argument numerous times. See *Richmond*, 289 Kan. at 447; *Reid*, 286 Kan. at 526; *Kirtdoll*, 281 Kan. at 1151; *Oliver*, 280 Kan. at 708; *State v. Engelhardt*, 280 Kan. 113, 143, 119 P.3d 1148 (2005); *State v. Wilkerson*, 278 Kan. 147, 160, 91 P.3d 1181 (2004); *State v. Hebert*, 277 Kan. 61, 107-08, 82 P.3d 470 (2004). McCaslin has not advanced any reason for us to retreat from this position now, and we decline to do so.

Issue 8: *We are without jurisdiction to review McCaslin's challenge to the presumptive sentences.*

McCaslin argues that the trial court's imposition of the aggravated terms in the presumptive grid boxes for the sentencing on the rape and aggravated arson convictions violates the law established in *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007). McCaslin received 246 months' imprisonment for the rape conviction and 61 months for the aggravated arson conviction, both of which are the aggravated terms in their respective sentence boxes. He claims these sentences violate *Cunningham* because it is impossible for a judge to impose the aggravated sentences without making findings of fact, which in turn is an unconstitutional act because the facts must be submitted to the jury.

The State responds that McCaslin received presumptive sentences that this court has no jurisdiction to review, citing *State v. Johnson*, 286 Kan. 824, 840-42, 190 P.3d 207 (2008). We agree. There, we examined the Kansas Sentencing Guidelines Act in the wake of *Apprendi* and its progeny. We concluded that "K.S.A. 21-4704(e)(1) grants a judge discretion to sentence a criminal defendant to any term within the presumptive grid block, as determined by the conviction and the defendant's criminal history." *Johnson*, 286 Kan. at 851. Consequently, we held that "under K.S.A. 21-4721(c)(1), this court is without jurisdiction to consider [the defendant's] challenge to his presumptive sentences even if those

sentences are to the longest term in the presumptive grid block for his convictions." 286 Kan. at 851-52; *Houston*, 289 Kan. at 278.

Issue 9: *The trial court did not violate McCaslin's rights when it imposed enhanced consecutive sentences without submitting the enhancing factors, i.e., prior convictions, to the jury for proof beyond a reasonable doubt.*

The trial court imposed consecutive sentences for McCaslin's convictions of rape and aggravated arson and used his criminal history to enhance both sentences. McCaslin claims a violation of his Sixth and Fourteenth Amendment rights under the United States Constitution because his prior criminal convictions had not been found beyond a reasonable doubt by the jury in the instant case. He contends the majority in *Apprendi* expressed reservations regarding the previous holding in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), and claims that "[a] majority of the United States Supreme Court has now indicated that prior convictions that increase the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." He cites *Shepard v. United States*, 544 U.S. 13, 125 S. Ct. 1254, 161 L. Ed. 2d 205 (2005) (Thomas J., concurring in part). McCaslin also claims that in *Johnson v. United States*, 544 U.S. 295, 306, 152 S. Ct. 1571, 161 L. Ed. 2d 542 (2005), the Court rejected an argument that convictions are fundamentally different from other facts that can enhance a sentence. He asserts that in light of the holdings in *Shepard* and *Johnson*, both decided after *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002), this court should reconsider its holding in *Ivory*.

The State argues there is no reason to overrule *Ivory*. In *State v. Fewell*, 286 Kan. 370, 184 P.3d 903 (2008), we analyzed an identical argument post-*Shepard* and *Johnson*. There, this court upheld the constitutionality of the Kansas Sentencing Guidelines Act, reaffirming this court's holding in *Ivory*. 286 Kan. at 393-96. We reached a similar holding in *State v. Brinklow*, 288 Kan. 39, 54-55, 200 P.3d 1225 (2009). As we stated in *State v. Gonzalez*, 282 Kan. 73, 118, 145 P.3d 18 (2006):

"[E]ven if the defendant cited factual circumstances sufficient to distinguish his situation from that of the defendant in *Ivory* (which he does not), given that the United States Supreme Court has reaffirmed the *Almendarez-Torres* exception three times in the last year, and given that United States Circuit Courts are reluctant to disturb this rule despite some disapproving language in concurring opinions, *Ivory's* holding remains good law."

McCaslin has not advanced any reason for us to retreat from this position, and we decline to do so. The imposition of enhanced consecutive sentences was proper.

Issue 10: *McCaslin was not deprived of his right to a fair trial by cumulative error.*

Finally, McCaslin argues that cumulative error denied him a fair trial, requiring reversal of his convictions and remand for a new trial. The State responds no error was committed; but if so, any accumulation did not deny McCaslin a fair trial.

Cumulative error requires reversal when the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Sharp*, 289 Kan. 72, 106, 210 P.3d 590 (2009). We have often held that reversal is not required if the evidence is overwhelming against the defendant. *Reid*, 286 Kan. at 523-24.

In Issue 3, we disapproved of several instances of the prosecutor's conduct in the trial. We ultimately concluded, however, that his misconduct alone was of insufficient magnitude to grant a new trial in light of the evidence in the case. Because we found no other errors, we logically reject McCaslin's request for a new trial.

Affirmed.

\* \* \*

JOHNSON, J., dissenting: I respectfully dissent. I would find that individual instances of prosecutorial misconduct constituted plain error under the second step of our analysis, *i.e.*, individually, the conduct was gross and flagrant, it showed ill will, and the error was not harmless beyond a reasonable doubt. See *State v. Bryant*, 285 Kan. 970, Syl. ¶ 2, 179 P.3d 1122 (2008) (stating three factors to consider in determining whether a new trial should be granted). Moreover, in my view, the "several instances" of misconduct to

which the majority refer accumulated to substantially prejudice the defendant and deny him a fair trial. See *State v. Houston*, 289 Kan. 252, 277-78, 213 P.3d 728 (2009) (stating when cumulative error requires reversal).

I begin with the prosecutor's "question" during cross-examination of the defendant, which the prosecutor stated as follows: "Are you aware that [the victim's] friend said—you would not be aware because it's not in the police reports that she said she would never—she never would have had sex with you?" Before discussing the misconduct implications of the prosecutor's question, I pause to comment on the majority's declination to consider the matter as an evidentiary error.

To the extent the majority's decision intimates that defense counsel's objection to the question was deficient under K.S.A. 60-404, I strongly disagree. The content of the question discloses that the prosecutor's statement was not really a question at all. In propounding the "question," the prosecutor acknowledged that the defendant would not be aware of the victim's friend's out-of-court statement. Accordingly, the question was not asking the witness to relate hearsay testimony. Rather, the question was obviously, on its face, an attempt to introduce rebuttal evidence through the unsworn testimony of the prosecutor. The defense attorney's objection, timely delivered in the heat of trial before the witness could respond, was spot-on correct. The specific error being committed was that the prosecutor was "stating facts not in evidence." That specific, timely, and accurate objection gave the trial court ample opportunity to avoid the use of tainted evidence and thereby avoid possible reversal and a new trial. See *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010). The trial court simply erred.

The majority, having the benefit of reflection without the time constraints of having to make a contemporaneous trial objection, suggests that defense counsel should have also advised the trial judge that the consequence or by-product of the prosecutor's statement of facts not in evidence was to inject the trial with hearsay evidence from a witness the defendant would not be able to confront and cross-examine. First, the trial judge did not provide defense counsel such an opportunity, cutting off further defense ar-

gument with the declaration, "Overruled. You can answer the question." Further, I would not expect defense attorneys to have to assume the responsibility of educating the trial judge on the rather fundamental and elementary reasons that a prosecutor is not permitted to state facts not in evidence, *e.g.*, to preclude the introduction of hearsay evidence or to avoid violating the defendant's right of confrontation. When given the opportunity to make such arguments, the defendant attempted to educate the trial court in his motion for new trial. Even then, the court did not grasp the problem, opining that the court probably should have sustained the objection based upon the form of the question. In short, I cannot find fault with the manner in which defense counsel dealt with the unequivocally improper "question" or the court's unequivocally erroneous ruling on the objection, the improper question, and the admissibility of the resulting improper evidence.

If there is any preservation problem, it must lie with the appellate treatment of the erroneous trial court ruling. The majority summarily concludes that we cannot consider whether the prosecutor stated facts not in evidence because that question was not briefed or argued on appeal. Instead, appellate counsel focused on the possible consequences of the erroneous ruling, that being the introduction of hearsay evidence and the violation of the defendant's right of confrontation. Nevertheless, the underlying *issue* raised on appeal is the erroneous admission of the prosecutor's statement, which was preserved through an appropriately specific and timely objection, as mandated by K.S.A. 60-404.

Accordingly, the majority's refusal to consider whether the prosecutor stated facts not in evidence is not a function of applying K.S.A. 60-404. Rather, support for the majority's decision to decline appellate review of the facts-not-in-evidence complaint must emanate from the court's own rule that an issue not briefed by the appellant is deemed waived and abandoned. See, *e.g.*, *State v. Martin*, 285 Kan. 994, 179 P.3d 457, *cert. denied* 555 U.S. 880 (2008). Apparently, the majority feels the "deemed abandoned" rule applies to the specific grounds argued in support of the preserved issue of inadmissibility. However, this court frequently decides a preserved issue based on a ground or reason that differs from that

relied upon by the district court or argued by the parties. See, *e.g.*, *State v. Murray*, 285 Kan. 503, 533, 174 P.3d 407 (2008) (district court may be affirmed even where it assigned an erroneous reason for its decision); *State v. Conn*, 278 Kan. 387, 393-94, 99 P.3d 1108 (2004) (preserved issue of inadmissibility of evidence decided on a warrantless search exception not relied upon by the district court or argued on appeal by the State).

Quite frankly, I do not need the appellant to explain to me that the prosecutor's "question" was a statement of facts not in evidence, as defense counsel so succinctly pointed out. Further, extensive briefing or argument is unnecessary to inform me that stating facts not in evidence is erroneous. In my view, the issue was presented here in a manner that permitted meaningful appellate review. I would have reached the merits and declared the district court's ruling to be plainly erroneous and reversible.

Nevertheless, in this case, we have another manner in which to rectify the error, via prosecutorial misconduct. Defense counsel contemporaneously objected to the prosecutor's improper conduct, *i.e.*, stating facts not in evidence. See *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) (requiring contemporaneous objection to prosecutor's improper questioning). When a prosecutor refers to facts not in evidence, such statements tend to make the prosecutor his or her own witness offering unsworn testimony not subject to cross-examination. *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000). Accordingly, the first prong of the test for prosecutorial misconduct has been met when it is established that the prosecutor argued facts that were not in evidence. See *Murray*, 285 Kan. at 512. Therefore, I wholeheartedly agree with the majority's determination that the question constituted prosecutorial misconduct. See *McCaslin*, 291 Kan. at 721-22.

Likewise, I share the majority's view that the prosecutor's question "demonstrated ill will, lack of good faith, and was gross and flagrant." 291 Kan. at 722. However, I disagree with the majority's singular reliance on the third factor of the second step of the analysis—the other evidence against the defendant. See *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009) (none of three factors individually controlling; third factor may not override first

two factors unless harmless error tests met). Considering all three factors, I would not find that the third factor controls and overrides the first two.

The purpose of the prosecutor's question was to rebut defendant's testimony that he had consensual sex with the victim. It was a critical point, given the physical evidence establishing that defendant had sexual intercourse with the victim. I am not prepared to declare beyond a reasonable doubt that the rebuttal of defendant's consensual sex assertion had little, if any, likelihood of having changed the result of the trial. *McReynolds*, 288 Kan. at 323. Moreover, the prejudice was compounded by the trial court's implicit stamp of approval on the improperly admitted evidence by overruling defendant's objection. *Cf. State v. Angelo*, 287 Kan. 262, 285, 197 P.3d 337 (2008) (prosecutor's error may be cured by sustaining defendant's objection and admonishing the jury to disregard it, unless incurably prejudicial).

Moreover, although not discussed by the parties or the majority, one might question whether the victim's friend would have been permitted to testify on rebuttal as to her personal opinion that the victim would never have chosen defendant for a sex partner. Query: Would defendant's mother have been permitted to testify as to her personal opinion that her son would never have raped anyone? If the hearsay evidence could not have come in through the declarant's testimony as a lay opinion, then the prosecutor's presentation of that inadmissible evidence through his own, unsworn testimony is more egregious and clearly plain error.

Although I believe the prosecutor's unsworn testimony was sufficient, standing alone, to require reversal, I view the other instances of prosecutorial misconduct described by the majority as confirmation that defendant was denied a fair trial. I especially take exception to the majority's characterization of the cross-examination exchange in which the prosecutor declared that the defendant had "walked in on more bodies like that than I have." Even from the cold record, that exchange exudes prosecutorial ill will. Granted, as the majority notes, the defendant was being an evasive and combative witness. However, finding a reason for misconduct is not the same as finding an excuse for such action. Moreover, as

the majority notes, the prosecutor's comments painted the defendant as a disreputable character who might have killed before. I cannot declare that to be harmless beyond a reasonable doubt.

I would find the prosecutorial misconduct denied the defendant his right to a fair trial. "Denial of a fair trial violates the due process rights of the guilty defendant just as surely as those of the innocent one." *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004). I would reverse for a new trial.